UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

LLOYD DANZIG,                                    :
                                                 :
                              Plaintiff,         :          Case No. 1:20-cv-10035
                                                 :
              - against -                        :          **COMPLAINT**
                                                 :
ERNIE ENTERPRISES, LLC, PATRICK                  :
HEALY, and ISSUER NETWORK, LLC                   :
                                                 :
                              Defendants.        :
-----------------------------------------------------------x

Plaintiff Lloyd Danzig ("Plaintiff"), by and through his attorneys, DLA Piper LLP (US),

as and for his Complaint herein against defendants Ernie Enterprises, LLC ("Ernie Enterprises" or

the "Company") Patrick Healy, and Issuer Network, LLC ("Issuer Network") (collectively,

"Defendants"), alleges as follows:

## INTRODUCTION

1.      Defendants engaged in a scheme to lure consultants and investors into providing

services, capital and resources to Ernie Enterprises based on the Company's and Mr. Healy's false

representations, all while Mr. Healy directed the Company and its employees to engage in

questionable business practices designed to financially benefit himself and his other company,

Issuer Network, at the expense of other interested parties..

2.      Additionally, and notwithstanding Mr. Danzig's tireless work for the Company,

including Mr. Danzig's numerous attempts to correct the Company's questionable approaches to,

among other things, fundraising, marketing and accounting, following the Company's abrupt

termination of Mr. Danzig's engagement, the Company refused, without justification, to honor its

obligation to pay Mr. Danzig the guaranteed retainer payment expressly provided for under Mr.

Danzig's advisory agreement (the "Advisory Agreement") with the Company.

3.      When Mr. Healy, the Founder and CEO of Ernie Enterprises, a start-up sports social networking company, recruited Mr. Danzig and his expertise in fundraising for start-up companies in the sports industry into entering into an advisory arrangement with the Company, Mr. Healy agreed to provide Mr. Danzig, among other forms of consideration, a guaranteed retainer payment of $30,000.  In convincing Mr. Danzig to enter the Advisory Agreement, Mr. Healy made specific, factual representations with regard to the Company's then-current valuation and the status of its fundraising efforts and its relationships with major sports franchises.  Specifically, the Company represented to Mr. Danzig that: (i) an independent accounting firm had certified and validated the $10 million valuation at which Company sought to raise capital; (ii) the Company had raised $600,000 in outside funding; and (iii) the Company had established lucrative partnerships with major sports franchises.  None of it was true.  Indeed, it was knowingly false.

4.      On or about March 9, 2020, Mr. Danzig and the Company executed the Advisory Agreement, under which the Company agreed, among other things, that: (i) "[a] lump-sum payment equal to six (6) months' retainer, totaling $30,000.00 USD, will be made to Advisor, by Company, upon the Funding Date or six (6) calendar months following the Agreement Date, whichever occurs first" ("Guaranteed Retainer Payment"); and (ii) "[u]pon the Funding Date, Advisor will join the company's board and continue to receive monthly payments of $5,000 USD, for a period of no less than six (6) months" ("Board Payments").  Mr. Danzig made the decision to execute the Advisory Agreement and provide services to the Company thereunder, foregoing other lucrative business opportunities, based on the agreed upon compensation terms and the other representations made by Mr. Healy and Ernie Enterprises.

5.      After Mr. Danzig's engagement with the Company commenced in March 2020, Mr. Danzig was shocked to learn that the Company had yet to even begin building the product they

claimed to have been working on for three (3) years and, contrary to Mr. Healy's representations, had no established partnerships with any major sports franchise.

6.     Furthermore, Mr. Danzig discovered that, contrary to previous representations, the Company had in fact not raised any outside funding.  Rather, at Mr. Healy's direction, Issuer Network had been funding all of the Company's expenses and claiming those expenses as tax deductions.

7.     In fact, Mr. Healy explicitly stated to Mr. Danzig on multiple occasions that Ernie Enterprises was created to serve as a "tax shelter" for himself and Issuer Network.  By way of example, in an April 10, 2020 email to Mr. Danzig, Mr. Healy stated: "the broad funding strategy since 2017 has been to fund Ernie (and its predecessor, FansUnited) via earnings from my other company, Issuer Network. That company throws off cash from listing companies on the NYSE and Nasdaq.  Hence, Ernie has been fully funded by and provided tax shelter to my fairly successful Wall Street firm."

8.     In addition, Mr. Danzig raised a number of concerns regarding the Company's use of unsubstantiated, unrealistic financial projections throughout their marketing materials, particularly those used to solicit employees and investors.  For example, Mr. Danzig raised concerns regarding the specific assumptions that were critical to the Company's investment materials and, among other things, requested evidence supporting the Company's claim that it would grow revenues from $10 million in 2020 to $862 million in 2021.  However, the Company refused, or was unable, to provide supporting documentation or information in response to Mr. Danzig's inquiries.

9.     Nonetheless, the Company, at Mr. Healy's direction, continued utilizing data points and financial projections known to be erroneous and factually misleading when soliciting

employees and investors, while simultaneously representing, that an independent accounting firm had certified and validated the alleged $10 million valuation at which Company sought to raise capital.  In fact, Mr. Danzig learned that no such certification or validation had ever occurred. Rather, an independent accounting firm had certified that a business which attained the level of success that the Company was projecting for itself would be worth the valuation stated.  Upon information and belief, there was no claim on behalf of the independent accounting firm that the projections were reasonable or attainable.

10.     Each time Mr. Danzig raised concerns with regard to the Company's marketing materials and the other representations that the Company was making to employees and potential investors, he was met with aggression and threatening behavior by Mr. Healy and other Company representatives.

11.     In addition, Mr. Danzig became aware of other questionable business practices, including that Mr. Healy routinely commingled his personal assets, and the assets of Issuer Network, with those of the Company and routinely ignored corporate formalities in the operation of the businesses.

12.     On or around May 27, 2020, Mr. Healy emailed Mr. Danzig to inform him that Ernie Enterprises was terminating his engagement under the Advisory Agreement.  No reason for the termination of Mr. Danzig's engagement was provided.  However, correspondence between Mr. Healy and Mr. Danzig leading up to the termination reveals there to be only one possible motivation: because Mr. Danzig had become aware of, and continued to raise concerns regarding, the highly questionable business practices that the Company, at Mr. Healy's direction, was engaging in for the sole purpose of furthering Mr. Healy's personal financial interests and the business interests of Issuer Network.

13.     Following the termination of his engagement, Mr. Danzig inquired about the status of the payments due to him under the Advisory Agreement.  In reply, Mr. Healy confirmed the Company would abide by its payment obligations.  Indeed, there is no basis in the Advisory Agreement to refuse to make this guaranteed payment.

14.     However, the Company did not deliver the guaranteed retainer payment to Mr. Danzig on or before September 9, 2020.

15.     To date, and despite Mr. Danzig's repeated requests, the Company has not provided, and continues to refuse to provide, Mr. Danzig with any of the agreed upon compensation for the services he provided to the Company, and refuses to confirm it will comply with its other ongoing contractual obligations to Mr. Danzig.

16.     Accordingly, Mr. Danzig seeks, by way of relief, among other things, an order: (i) directing Defendants to provide the Guaranteed Retainer Payment to Mr. Danzig; (ii) awarding Mr. Danzig damages equal to the Board Payments; (iii) directing Defendants to reimburse Mr. Danzig for all attorneys' fees and expenses incurred in connection with this dispute; and (iv) finding Mr. Healy, Ernie Enterprises, and Issuer Network each jointly and severally liable for the aforementioned payments and any and all damages awarded to Mr. Danzig.

## PARTIES

17.     Defendant Ernie Enterprises is a Maryland limited liability corporation, with its principal place of business at 6935 Wisconsin Ave #500, Bethesda, MD 20815.  Ernie Enterprises is a technology company purportedly focused on developing a social network for sports fans.

18.     Defendant Patrick Healy is the Founder and CEO of Ernie Enterprises and Issuer Network.  Upon information and belief, Mr. Healy resides in Bethesda, Maryland.

19.     Upon information and belief, Defendant Issuer Network is a Maryland limited liability corporation, with its principal place of business at 6935 Wisconsin Ave #500, Bethesda, MD 20815.  Issuer Network purports to be an advisory business that consults publicly traded companies about their listings on stock exchanges.

20.     Plaintiff Lloyd Danzig is an expert in the sport, technology and venture capital industries.  Mr. Danzig resides in New York, New York.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant 28 U.S.C. § 1332(a)(2), in that Plaintiff's claims exceed the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

22.     Venue is proper under 28 U.S.C. § 1391(b) because the events underlying this action occurred within the Southern District of New York and because Defendants engage in business within the District.

## ALLEGATIONS COMMON TO ALL CLAIMS

23.     In or around February 2020, Mr. Danzig was contacted by Mr. Healy about an opportunity with his company, Ernie Enterprises.

24.     On or about February 18, 2020, Mr. Danzig participated in a phone interview with Mr. Healy, Founder and CEO of Ernie Enterprises.  On this call, Mr. Healy represented to Mr. Danzig that Ernie Enterprises: (i) had obtained an independently audited valuation of $10 million; (ii) had raised $600,000 in "outside funding"; and (iii) had established lucrative partnerships with major sports franchises.

25.     Upon information and belief, Mr. Healy made these representations to Mr. Danzig, employees and potential investors.

26.     At the end of the February 18, 2020 phone interview, Mr. Healy informed Mr. Danzig that the Company would like to engage Mr. Danzig as an outside advisor to assist with the Company's fundraising efforts.  Mr. Healy initially offered Mr. Danzig a number of equity-based and incentive-based compensation arrangements.  However, Mr. Danzig made clear he would only accept compensation in the form of guaranteed cash payments.

27.     Based on Mr. Healy's representations, Mr. Danzig informed Mr. Healy that he was interested in working with Ernie Enterprises, contingent upon the Company's agreement to provide Mr. Danzig with guaranteed payments that would not be dependent upon the duration or outcome of the business relationship.

28.     In or around February 2020 and March 2020, Mr. Danzig was also interviewing for positions at, and pursing engagements with, a number of other start-ups that provided compelling compensation packages.

29.     On or about February 28, 2020, Mr. Healy emailed Mr. Danzig to extend an official offer to join the Company as a consultant, which provided for the following compensation arrangement: "Cash - $3,000 per month retainer for serving as a member of the EE Advisory Board post funding. Equity - $250,000 of EE stock (or 2.5% of its current valuation of $10MM)." Consistent with Mr. Healy's prior representations, that offer indicated that the Company's current valuation had been assessed at $10 million.  Mr. Danzig rejected this proposal on the grounds that there was no guaranteed cash compensation.

30.     On or about March 3, 2020, Mr. Healy proposed a new compensation arrangement to Mr. Danzig: "Cash - number of months x $3k x 2.  That cash will be paid to you on the first tranche funding.  You will serve as an advisor (post funding) for one month for every $3k you are paid. Equity - 2% of ernie Enterprises.  1% vests immediately.  The other 1% vests using this

formula (\$ total raised thru SharpAlpha / \$2,000,000) x 1%." Mr. Danzig again rejected this proposal on the grounds that it did not include guaranteed cash compensation.

31.     On or about March 4, 2020, Mr. Healy proposed another new compensation arrangement to Mr. Danzig: "\$3,000/month billed bi-weekly; 0.50% equity allocation that vests immediately upon issuance; Equity increases subject to negotiated vesting schedule as follows: (funding \$\$\$ derived from Sharp Alpha sources / \$2,000,000) x 1.5% equity allocation."  Mr. Danzig rejected this proposal on the grounds that too much compensation was tied to non-guaranteed sources and outcomes.

32.     On or about March 9, 2020, Mr. Healy called Mr. Danzig to propose a compensation arrangement that, provided for, among other things, a guaranteed \$30,000.00 lump-sum payment to be made no later than six (6) months after the date of their agreement (i.e., the Guaranteed Retainer Payment).

33.     Mr. Danzig verbally accepted this offer, foregoing other lucrative business opportunities he was pursuing at the time, based on the agreed upon compensation terms and the other representations made by Mr. Healy and Ernie Enterprises.

34.     This offer was subsequently memorialized in writing, and executed by Mr. Danzig and Mr. Healy, in the Advisory Agreement, dated March 9, 2020 (attached hereto as Exhibit A).

35.     Section 2 of the Advisory Agreement provides as follows with respect to Mr. Danzig's compensation:

> "**CONSIDERATION**.  As consideration in return for the provision of the Services, the Company will provide the Advisor with a non-refundable monthly cash retainer of **\$5,000.00 USD**, payable according to the stipulations outlined on **Schedule B** attached hereto.  The **\$30,0000.00 USD** payment specified therein shall be payable upon the Funding Date or at a time six (6) months from the Agreement Date, whichever occurs first, and shall not be delayed, abrogated, or otherwise evaded for any reason."

36.    The Advisory Agreement's Signature Page provides as follows with regard to Mr. Danzig's compensation:

"**Advisor Cash Compensation**: $5,000 monthly retainer w/ 6-month guarantee, payable according to Schedule B."

37.    Schedule B to the Advisory Agreement provides, in pertinent part, as follows with regard to Mr. Danzig's compensation:

"The Compensation specified by this Agreement will be conveyed via bank transfer, or any other accepted payment method by Advisor, pursuant to the following schedule and conditions:

1.  A lump-sum payment equal to six (6) month's retainer, totaling $30,000.00 USD, will be made to Advisor by Company, upon the Funding Date OR six (6) calendar months following the Agreement Date, whichever occurs first.
2.  Upon the Funding Date, Advisor will join the company's board and continue to receive monthly payments of $5,000.00 USD, for a period of no less than six (6) months…

38.    Section 12 of the Advisory Agreement provides as follows with regard to the settlement of disputes:

"**<u>SETTLEMENT OF DISPUTES.</u>**   In the event of any dispute between Advisor (or Advisory Firm) and Company, or any representatives thereof, regarding the interpretation, execution, or performance of this Agreement, both Advisor and Company agree to participate in a mediation or substantially similar resolution process with the other, without charge to Advisor.  Only in the event that a good faith attempt by both parties to resolve said dispute by process of mediation shall either party endeavor to resolve that dispute by way of litigation.  Advisor retains the right to Choice of Law and/or Venue in the event that a dispute arises."

39.    Section 13 of the Advisory Agreement provides as follows with regard to attorneys' fees:

**<u>ATTORNEY'S FEES.</u>**   In the event that Advisor requires the employment of an attorney or attorneys in order to collect the consideration owed under the Agreement, or to enforce any other rights conveyed by same, expressly or implicitly, Advisor shall be entitled to collect from the Company all costs incurred in such dispute, including reasonable attorneys' fees."

40.     Mr. Danzig began providing advisory services to Ernie Enterprises immediately following the execution of the Advisory Agreement on or about March 9, 2020.

41.     Shortly after Mr. Danzig commenced his engagement with Ernie Enterprises in March 2020, Mr. Healy began requesting that Mr. Danzig complete numerous additional projects that extended well beyond the initial scope of work contemplated by the Advisory Agreement.

42.     On or about March 12, 2020, Mr. Healy requested that Max Firtel, the Company's Managing Director of Product Development, send Mr. Danzig a summary of the Company's fundraising efforts, which Mr. Danzig noticed contained information that was at odds with information previously provided by Mr. Healy.  Among other things, the amount of outside funding raised was listed as $550,000 rather than $600,000, contrary to Mr. Healy's previous representations.

43.     Mr. Danzig was also shocked to learn that the Company had yet to even begin building the product they claimed to have been working on for three (3) years and, contrary to Mr. Healy's representations, had no established partnerships with major sports franchises.

44.     Furthermore, Mr. Danzig discovered that, contrary to the Company's previous representations to Mr. Danzig, the Company had in fact not raised any outside funding.  Rather, Mr. Healy communicated to Mr. Danzig that Issuer Network had been funding all of the Company's expenses and claiming those expenses as tax deductions.

45.     On or about April 10, 2020, Mr. Healy sent an email to Mr. Danzig stating: "the broad funding strategy since 2017 has been to fund Ernie (and its predecessor, FansUnited) via earnings from my other company, Issuer Network. That company throws off cash from listing companies on the NYSE and Nasdaq.  Hence, Ernie has been fully funded by and provided tax shelter to my fairly successful Wall Street firm."

46.     During Mr. Danzig's engagement with the Company, Mr. Danzig raised a number of concerns regarding the Company's use of unsubstantiated, unrealistic financial projections throughout their marketing materials, particularly those used to solicit investors.  For example, Mr. Danzig raised concerns regarding the specific assumptions that were critical to the Company's investment materials and, among other things, requested evidence supporting the Company's claim that it would grow revenues from $10 million in 2020 to $862 million in 2021.  However, the Company refused, or was unable, to provide supporting documentation or information in response to Mr. Danzig's inquiries.

47.     Upon information and belief, during Mr. Danzig's engagement with the Company, the Company, at Mr. Healy's direction, continued utilizing data points and financial projections Mr. Healy knew to be erroneous and misleading when soliciting employees and investors, while simultaneously representing, as the Company had to Mr. Danzig, that an independent accounting firm had certified and validated the alleged $10 million valuation at which Company sought to raise capital.  In fact, Mr. Danzig learned that no such certification or validation had ever occurred. Rather, an independent accounting firm had certified that a business *which attained the level of success that the Company was projecting for itself* would be worth the valuation stated.  There was no claim on behalf of the independent accounting firm that the projections were reasonable or attainable, despite Mr. Healy and Ernie Enterprises representing otherwise to employees and potential investors in the regular course of business, just as he made to Mr. Danzig.

48.     Each time Mr. Danzig raised concerns with regard to the Company's marketing materials and other representations that the Company was making, he was met with aggression and threatening behavior by Mr. Healy and various Company representatives.

49.    On or about March 26, 2020, Mr. Danzig inquired as to Mr. Healy's expectations for the Company's future.  The Company, at the time, already was failing to meet the 2020 revenue goals it had communicated to Mr. Danzig.  In response, Mr. Healy insisted that the Company's revenue projections were only increasing upwards. Indeed, every time Mr. Healy communicated the Company's prospects to Mr. Danzig, he stated that the Company's revenue projections were improving and instructed Mr. Danzig to communicate same to potential investors.

50.    When Mr. Danzig told Mr. Healy that it was not appropriate to advertise Ernie as the "first" or "only" social network for sports fans, due to the plethora of other competing platforms, Mr. Healy responded in such a way that confirmed he had not done any such diligence or research and did not plan to.

51.    During his engagement with the Company, Mr. Danzig also became aware that the Company and Mr. Healy were engaging in a number of other questionable business practices. Specifically, and among other things, Mr. Danzig became aware that: (i) the Company did not appear to be formally capitalized in any way, and was indeed under-capitalized; (ii) Mr. Healy did not have office space dedicated to this venture, and instead operated the Company out of Issuer Network's offices; (iii) the Company did not have an operating agreement; (iv) the Company did not have a separate bank account and Mr. Healy was commingling his personal assets and the assets of his other Company, Issuer Network, with those of the Company; and (vi) it appeared Mr. Healy was using Company funds for personal expenses.

52.    On or about May 26, 2020, Mr. Danzig's became aware that Mr. Healy had again retroactively adjusted the amount of outside funding the Company had reportedly raised downward, from $600,000 to $350,000.  That same day, Mr. Danzig sent Mr. Healy an email inquiring about this new fundraising figure: "Can you please give me a breakdown of that $350k.

One way to think about it is like this. Imagine someone were to ask you, 'You guys have spent $350k on Ernie.com thus far and are asking for more money. In order for me to invest my money and know that it will be used well, I want to know how well you used the $350k that you started with. What have you done and what success/progress have you had with that money that will help me be confident in continued and future success?'"  Mr. Healy did not respond to this email.

53.      On or around May 27, 2020, Mr. Healy emailed Mr. Danzig to inform him that Ernie Enterprises was terminating his engagement with the Company.  Mr. Healy did not provide any reason for the termination of Mr. Danzig's engagement.

54.      Upon information and belief, Mr. Healy terminated the Company's engagement with Mr. Danzig because Mr. Danzig had become aware of, and continued to raise concerns regarding, the questionable business practices that the Company, at Mr. Healy's direction, was engaging in, and which appeared to be for the sole purpose of furthering his personal financial interests and the interests of Issuer Network.

55.      On or around June 10, 2020, Mr. Danzig emailed Mr. Healy regarding the status of the payments he was owed under the Advisory Agreement.  In response, Mr. Healy wrote, "any appropriate payments outlined within the agreement will be paid at the time due."

56.      However, the Company did not make provide the Guaranteed Retained Payment, or any payments whatsoever, to Mr. Danzig on or before September 9, 2020.

57.      On September 18, 2020, Mr. Danzig's counsel emailed a letter to Mr. Healy that, among other things: (i) advised Mr. Healy that the Company had materially breached, and continued to be in breach of, its obligations under the Advisory Agreement as a result of its failure to pay Mr. Danzig the Guaranteed Retainer Payment by September 9, 2020; (ii) demanded that the Company immediately deliver the Guaranteed Retainer Payment to Mr. Danzig; and (iii) confirm

that it would comply with its other ongoing contractual obligations, including the Company's obligation to appoint Mr. Danzig to the Company's board of the directors on the Funding Date (as defined in the Advisory Agreement) for a minimum of six (6) months and provide Mr. Danzig the required Board Payments.

58.     In addition, the September 18, 2020 letter advised Mr. Healy that in the event the Company failed to abide by its obligations under the Advisory Agreement, Mr. Danzig's counsel would, on Mr. Danzig's behalf, institute a mediation in accordance with Section 12 of the Advisory Agreement and, in connection with same, would seek compensation for all payments Mr. Danzig was entitled to under the Advisory Agreement, including reimbursement for all attorneys' fees and costs incurred by Mr. Danzig in connection with this dispute, pursuant to Section 13 of the Advisory Agreement.  The letter further advised Mr. Healy that in the event such a mediation was unsuccessful, or the Company further breached the Advisory Agreement by refusing to participate in the mediation, Mr. Danzig would file a litigation to enforce his legal and contractual rights.

59.     On September 28, 2020, after not receiving any response whatsoever to the September 18, 2020 letter and in light of the Company's continued failure to provide Mr. Danzig the Guaranteed Retainer Payment, Mr. Danzig's counsel again contacted Mr. Healy via email to advise Mr. Healy that they intended, on Mr. Danzig's behalf, to institute a mediation in accordance with the Advisory Agreement's dispute resolution provision, and requested that the Company advise as to its availability in October 2020 to engage in a mediation.

60.     Later that day, the Company's attorney, William Dailey, responded by stating that he was "in the process of reviewing documents and preparing a response" to the September 18, 2020 letter, which he expected to provide in "the next few days."

61.     On October 2, 2020, Mr. Dailey responded to the September 18, 2020 letter with a one sentence response: "Please be advised that the company with which Mr. Danzig contracted is defunct and has no assets."

62.     On October 13, 2020, in light of the Company's ongoing refusal to provide the Guaranteed Retainer Payment or engage in mediation regarding same, Mr. Danzig's counsel sent an email to Mr. Dailey outlining Mr. Danzig's principal claims against Defendants and advising the Company that it had further breached the Advisory Agreement by refusing to engage in mediation, therefore waiving any obligation Mr. Danzig had to do so, and that Mr. Danzig intended to proceed with litigation against Defendants to enforce his legal and contractual rights.

63.     To date, Ernie Enterprises has refused, and continues to refuse, to honor its obligations to Mr. Danzig under the Advisory Agreement, including, without limitation, to provide Mr. Danzig the Guaranteed Retainer Payment.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Advisory Agreement)
### (As Against All Defendants)

64.     Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 63 as if fully set forth herein.

65.     The Advisory Agreement constitutes a valid, binding and enforceable contract.

66.     Plaintiff fully performed his obligations under the Advisory Agreement.

67.     Ernie Enterprises willfully, knowingly, and materially breached the Advisory Agreement by failing to provide the Guaranteed Retainer Payment to Mr. Danzig on or before September 9, 2020 and refusing to engage in mediation regarding same.

68.     Ernie Enterprises has no justification or excuse for its failure to provide Guaranteed Retainer Payment to Plaintiff.

69.     As a direct result of Ernie Enterprises breach of the Advisory Agreement, Plaintiff has sustained damages, including but not limited to actual and compensatory damages, in an amount to be determined at trial, as well as interest, costs and attorneys' fees incurred by Plaintiff in connection therewith.

## SECOND CAUSE OF ACTION
### (Repudiation of Contract)
### (As Against All Defendants)

70.     Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 69 as if fully set forth herein.

71.     From September 9, 2020 to the present, Defendants clearly and unequivocally repudiated their performance under the Advisory Agreement.

72.     As a direct result of Defendants' repudiation of the Advisory Agreement, Plaintiff has sustained damages, including but not limited to actual and compensatory damages, in an amount to be determined at trial, as well as interest, costs and attorneys' fees incurred by Plaintiff in connection therewith.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)
### (As Against All Defendants)

73.     Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 72 as if fully set forth herein.

74.     Plaintiff, diligently and in good faith, performed sophisticated services for Defendants based upon, and in reliance on, Mr. Healy's and the Company's agreement to provide the Guaranteed Retainer Payment to Plaintiff and the Board Payments, pursuant to the terms of the Advisory Agreement.

75.     Defendants accepted and used Plaintiff's services and benefited therefrom to Plaintiff's detriment.

76.     Plaintiff reasonably and justifiable expected to receive the Guaranteed Retainer Payment and Board Payments.

77.     Defendants received Plaintiff's services without adequately compensating Mr. Danzig in accordance with the Advisory Agreement.

78.     By reason of the foregoing, Defendants have been unjustly enriched.

79.     Equity and fairness require that Defendants compensate Plaintiff for the value of the services he provided to Defendants by granting him the Guaranteed Retainer Payment and Board Payments enumerated in the Advisory Agreement.

**FOURTH CAUSE OF ACTION**
**(Promissory Estoppel – Cash Compensation)**
**(As Against All Defendants)**

80.     Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 79 as if fully set forth herein.

81.     By entering into the Advisory Agreement on or about March 9, 2020, Defendants clearly and unambiguously promised that it would provide Plaintiff the Guaranteed Retainer Payment and Board Payments, pursuant to the terms of the Advisory Agreement.

82.     Plaintiff reasonably and foreseeably relied on Defendants' promises to grant him the Guaranteed Retainer Payment and Board Payments.

83.     In relying upon Defendants' promises, Plaintiff: (i) ceased pursuing other lucrative business opportunities; (ii) executed the Advisory Agreement with, and provided services to, Defendants; and (iii) performed sophisticated services for Defendants.

84.     The foregoing notwithstanding, to date, Defendants have refused to provide Plaintiff Guaranteed Retainer Payment and Board Payments, or otherwise compensate him for, the services he provided to Defendants.

85.     As a direct result of Defendants' unfulfilled promises, Plaintiff has sustained damages, including but not limited to actual compensatory damages, in an amount to be determined at trial, as well as interest, cost and fees incurred by Plaintiff in connection therewith.

## FIFTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (As Against All Defendants)

86.     Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 85 as if fully set forth herein.

87.     Defendants entered into a binding and enforceable agreement (i.e., the Advisory Agreement) with Plaintiff, pursuant to which the Company was required to provide Plaintiff with the Guaranteed Retainer Payment and Board Payments, in exchange for the services Plaintiff provided to Defendants.

88.     By failing to provide Plaintiff the Guaranteed Retainer Payment and Board Payments, Defendants have breached the implied covenant of good faith and fair dealing.

89.     As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered, and continues to suffer, harm for which he is entitled to an award of monetary damages and other relief.

## SIXTH CAUSE OF ACTION
### (Declaratory Judgment)
### (As Against All Defendants)

90.     Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 89 as if fully set forth herein.

91.     Declaratory relief is available which shall have the effect of a final judgment as to the right and other legal relations of the parties to a justiciable controversy.

92.     Defendants entered into a binding and enforceable agreement (i.e., the Advisory Agreement) with Plaintiff, pursuant to which the Company was required to provide Plaintiff the Guaranteed Retainer Payment and Board Payments, in exchange for the services Plaintiff provided Defendants.

93.     Plaintiff seeks a declaration that Mr. Danzig is entitled to the Guaranteed Retainer Payment and Board Payments, in addition to attorneys' fees and costs, pursuant to the terms of the Advisory Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgement against Defendants as follows:

(1)     directing Defendants to provide Plaintiff the Guaranteed Retainer Payment;

(2)     awarding Plaintiff damages equal to the Board Payments;

(3)     awarding actual and compensatory damages to Plaintiff in an amount to be proven at trial;

(4)     awarding punitive damages to Plaintiff in an amount to be proven at trial;

(5)     awarding Plaintiff the costs and disbursements of this action, together with reasonable attorneys' fees;

(6)     finding Mr. Healy, Ernie Enterprises, and Issuer Network to constitute a "single integrated enterprise" and that, as such, each Defendant is jointly and severally liable for all payments, including without limitation the Guaranteed Retainer Payment, Board Payments, Plaintiff's attorneys' fees and costs, and any and all other damages awarded to Plaintiff by the Court; and

(7)     awarding Plaintiff such other and further relief as this Court may deem just and proper.

Dated: New York, NY
November 30, 2020

Respectfully submitted,

**DLA PIPER LLP (US)**

By: _/s/ Joseph A. Piesco_
    Joseph A. Piesco
    Edward C. Rooker
    1251 Avenue of the Americas
    New York, New York 10020
    (212) 335-4537
    Joseph.Piesco@dlapiper.com
    Edward.Rooker@dlapiper.com

    *Attorneys for Plaintiff Lloyd Danzig*